MARK B. HANSON, ESQ.
mark@saipanlaw.com
Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738, P.O. Box 10,000
Saipan, Mariana Islands 96950
Telephone: (670) 233-8600 - Facsimile: (670) 233-5262

Attorneys for Plaintiff JUNIOR LARRY HILLBROOM

F I L E D
Clerk
District Court

APR 21 2010

For The Northern Mariana Islands
By_____
(Deputy Clerk)

# UNITED STATES DISTRICT COURT

# NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JUNIOR LARRY HILLBROOM, an individual,<br><br>Plaintiff,<br><br>v.<br><br>DAVID J. LUJAN, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO.  CV 10  0009<br><br>**COMPLAINT**<br><br>COUNTS:<br><br>I.    LEGAL MALPRACTICE<br>II.   BREACH OF FIDUCIARY DUTY<br>III.  FRAUD<br>IV.  VIOLATIONS OF 18 U.S.C. § 1961 *ET SEQ.* (RICO)<br>V.   CIVIL CONSPIRACY<br>VI.  VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT AND DEMAND FOR JURY TRIAL

1  Plaintiff Junior Larry Hillbroom by his undersigned attorneys hereby files his
2  Complaint and alleges on information and belief as follows:

3

4  **PARTIES**

5      1.      Plaintiff Junior Larry Hillbroom ("Junior" or "Hillbroom" or
6  "Plaintiff") is an individual who is a resident and domiciliary of Idaho.  He is and
7  was at all times relevant herein the sole Settlor and the sole mandatory beneficiary of
8  the JLH Trust, a financial trust registered in the Cook Islands, overseen by the
9  Superior Court of the Commonwealth of the Northern Mariana Islands ("CNMI")
10  and managed, operated and controlled in Morro Bay, California.  Junior was at all
11  times and continues to be the only beneficiary entitled to disbursements under the
12  JLH Trust terms.  This because the JLH Trust was designed to ensure that the trust's
13  assets were protected principally for Junior's use and benefit.  However, consistent
14  with Palauan family culture, Junior named a handful of family members as
15  discretionary beneficiaries to whom the Trustee had limited discretion to provide use
16  and enjoyment of funds.  None of the discretionary beneficiaries was entitled to any
17  disbursement of trust funds.

18      2.      Defendant David J. Lujan ("Lujan") is an individual who resides in
19  Hagatna, Guam who throughout the period described herein had continuous and
20  systematic contacts with CNMI and California.  Lujan attended college in California
21  and, until only after Plaintiff filed his original complaint in this matter, held himself
22  out to the public on his website to be admitted to the California State Bar.  Lujan is
23  admitted to the CNMI Bar.  Lujan has done a substantial amount of business in
24  CNMI and California, including providing legal services in CNMI and California.
25  While representing Junior and his interests, Lujan's contacts with CNMI were
26  continuous and systematic

27      3.      Barry J. Israel ("Israel") is an individual who Plaintiff is informed and
28  believes resided and resides in Santa Barbara, California.  Israel attended college in

1  California, has resided in California and was admitted to the California Bar

2  practicing law in California from 1975-2001.  At the time he represented Junior,

3  Israel was licensed to practice law by the California State Bar.  In particular, since

4  April 1999, Israel retained and did a great deal of business associated with this case

5  in California with the JLH Trust operating out of Goleta and then Morro Bay,

6  California.

7         4.     At all times relevant herein, Lujan and Israel (hereinafter jointly

8  "Attorneys") were lawyers retained to represent Junior and his interests, and Junior

9  was their client.  Although Junior was a minor throughout the majority of the

10  Attorneys' representation of him, the Attorneys personally and through their agents

11  made numerous Court appearances and filed numerous briefs in the *Estate of Larry*

12  *Lee Hillblom*, CNMI Superior Court Case No. 95-626 and associated guardianship

13  for Junior (jointly, "Hillblom Probate Case") and Guam Guardianship Case

14  specifically stating that they were appearing on Junior's behalf, representing Junior

15  and serving only Junior's interests.  On at least one occasion in the Guam

16  Guardianship Case, the Attorneys argued that Junior's original counsel, the Family

17  and Immigration Law Clinic ("FILC"), should be removed from representing Junior

18  because FILC claimed that Junior's guardians—and not Junior—were FILC's clients

19  "when in fact it is Junior who is the client and should be the named party acting

20  through his legal representatives."  In those same documents, the Attorneys also

21  argued that the FILC should be removed as Junior's counsel because it entered into a

22  secret retainer agreement that "was never authorized or approved by the Client,"

23  Junior.  The Attorneys also demanded that, because Junior "never authorized or

24  approved" the retainer, the Court strike that retainer, compel an accounting and

25  report FILC to the Guam and California bars for discipline.

26         5.     Keith A. Waibel ("Waibel") is an individual who resides in Morro Bay,

27  California and who at all times herein resided in California.  Waibel acted in his

28  representative capacity for the JLH Trust, any JLH co-trustee that he managed,

COMPLAINT AND DEMAND FOR JURY TRIAL

1  operated and controlled and personally for any actions deemed not performed in his
2  capacity under the JLH Trust. Waibel was at all times relevant herein one of two
3  trustees of the JLH Trust. While the JLH Trust provided for a nominal co-trustee,
4  Waibel at all times was the principle of that co-trustee and entirely managed,
5  operated and controlled. Furthermore, the terms of the JLH Trust provided that
6  Waibel's determinations governed the administration of the JLH Trust with or
7  without the co-trustee's concurrence or knowledge. Waibel alone carried out all of
8  the JLH Trust's business functions, including those at issue in this case. As a result,
9  neither the JLH Trust nor its co-trustee was independent of Waibel, there was no
10  meaningful difference between Waibel and any co-trustee and any co-trustee was
11  nothing more than Waibel's alter ego. In addition, Waibel so abused the trust
12  structure, that it would be inequitable to treat Waibel, any co-trustee and the JLH
13  Trust as separate entities with respect to the matters at issue herein. Because Waibel
14  was the representative for and controlled the JLH Trust and its co-trustees, each and
15  every JLH trustee failed and refused to act on any of the claims herein. In fact,
16  Waibel intentionally failed to cause the JLH Trust and its co-trustees to act on the
17  claims herein because of his own active involvement in perpetrating the scheme.

18       6.     For its entire existence, the JLH Trust has operated out of Waibel's
19  offices in California. The JLH Trust and its terms were proposed to and approved
20  by the Hillblom Probate Case throughout Waibel's administration of the JLH Trust,
21  Waibel and the JLH Trust did extensive business with the Attorneys in CNMI and
22  California through interstate correspondence with the Attorneys from California by
23  telephone, email, mail and the internet, receiving interstate instructions in California
24  from the Attorneys by telephone, email, mail and the internet and issuing payments
25  to the Attorneys by mail and wire instructions from Waibel's California offices

26       7.     Plaintiff hereinafter refers to Lujan, Israel and Waibel collectively as
27  "Conspirators."

28       8.     Plaintiff does not know the true names and capacities of Defendants

COMPLAINT AND DEMAND FOR JURY TRIAL

1 DOES 1 through 10 at this time, and Plaintiff will seek leave of court to amend this
2 complaint to allege such names and capacities as soon as Plaintiff ascertains them.

3     9.     Whenever Plaintiff refers to any act, deed, or conduct of
4 "Conspirators," said references mean that Defendant Lujan, Israel, Waibel, their
5 agents and DOES 1-10 engaged in the acts, deeds or conduct.

6     10.     Plaintiff is informed and believes and thereon alleges that at all relevant
7 times each of the Conspirators was the agent and employee of each of the remaining
8 Conspirators, and in doing the things hereinafter alleged  was acting within the
9 course and scope of such agency and employment.

10

11                    **JURISDICTION AND VENUE**

12     11.     Jurisdiction in the District of the Northern Mariana Islands is proper
13 under 28 U.S.C. § 1331 based on Junior's claims under 28 U.S.C. § 1961 *et seq.*

14     12.     Jurisdiction is also proper under 28 U.S.C. § 1332 based on the parties'
15 diversity of citizenship.  The amount in controversy exceeds $75,000.00 and is in
16 excess of the jurisdictional limit for the United States District Court.

17     13.     Venue is proper in this Court under 28 U.S.C. § 1391 because a
18 substantial part of the events or omissions giving rise to the claim occurred in the
19 District of the Northern Mariana Islands.

20     14.     On February 6, 2009, Plaintiff filed his original case against Lujan in
21 *Hillbroom v. Lujan*, C.D. Cal. Case No. 09-CV-0841 in the Central District of
22 California ("California Case").  On March 24, 2010, the California Case against
23 Lujan was dismissed after the Court found it did not have personal jurisdiction over
24 him and that "Guam or the CNMI are thus alternative forums where Plaintiff could
25 potentially bring his claims against Lujan."

26

27 \\\
28 \\\

COMPLAINT AND DEMAND FOR JURY TRIAL

1

## GENERAL ALLEGATIONS

2    15.    In May 1995, Larry L. Hillblom, the co-founder and former owner of

3  DHL Worldwide Express, died in an airplane crash, leaving behind four pretermitted

4  children and an estate worth approximately $550 million.

5    16.    Junior was one of Hillblom's pretermitted heirs who was at the time of

6  Hillblom's death a boy living in poverty with his mother in the Republic of Palau.

7  At 11 years-old, with little education, speaking only Palauan and having never left

8  his island nation, Junior learned in mid-1995 that proving that Hillblom was his

9  father would entitle him to large portion of Hillblom's $550 million estate.

10    17.    In or about June 1995, FILC executed a retainer for representing Junior

11 and his interests in the Hillblom Probate Case with a 20% contingency fee ("20%

12 Retainer").

13    18.    In or about late August 1995, Lujan became lead counsel for Junior's

14 claims in the Hillblom Probate Case and quickly executed a new retainer for a 22%

15 contingency fee with 11% to FILC and 11% to Lujan ("22% Retainer").  Around

16 this time, Lujan retained Israel to also represent Junior and his interests.

17    19.    In or about September 1995, the Attorneys filed a petition to appoint

18 Kinney as Junior's guardian in the Hillblom Probate Case establishing a

19 guardianship proceeding for Junior in CNMI.  That same month, the Attorneys filed

20 a petition to appoint Naoko Imeong ("Naoko"), Junior's grandmother, as a co-

21 guardian in the Guam Guardianship Case.

22    20.    In the summer of 1996 and as a result of a dispute with FILC and

23 Kinney over their attempts to make Johnnie Cochran lead counsel representing

24 Junior and because the Attorneys knew they had better control over Naoko, the

25 Attorneys filed a petition to name Naoko lead guardian in the Hillblom Probate

26 Case.  Although the Hillblom Probate Court refused to make Naoko Junior's lead

27 guardian in or about June 1996, it appointed Naoko to serve as Junior's co-guardian

28 along with Kinney.

5

21.    In the Spring of 1997, Junior established that Hillblom was his father through DNA testing.  As a result of this and other significant occurrences, the Hillblom Probate Case settled the Heirship claims, submitting it for approval  with both Hillblom Probate Court and Guam Guardianship Court approval by December 1997.  The approved Heirship settlement provided that the Hillblom estate would equally distribute 60% of its assets equally to the four qualified heirs, entitling Junior to 15% of Hillblom's $550 million estate.

22.    Because at the time of the December 1997 Hillblom Probate Case settlement, the operative 22% Retainer gave the Attorneys only an 11% contingency fee and knowing that Junior would recover approximately $90 million before taxes, the Attorneys began to increase their contingency fee by executing a new third retainer for representing Junior and his interests.

23.    In January 1998, the Attorneys convinced Naoko to execute a retainer providing the Attorneys with a 38% contingency fee of the gross amounts Junior recovered from the Hillblom estate and any other subsequent related litigation or settlement ("38% Retainer") and eliminating FILC from the picture.

24.    The services the Attorneys agreed to provide in the 38% Retainer were comprehensive and expansive, contemplating any actual and potential services Junior needed to both recover and maximize the Hillblom estate assets.  The Attorneys agreed to provide their services for "establishing Junior as Larry Hillblom's son, preserving and marshalling the Estate's assets, bringing lawsuits and setting up an appropriate trust to receive any amounts distributed to Junior."  They also agreed that the following services had already been performed and would be performed in the future to represent Junior and his interests:

- "Attorney's representation in this matter has involved extraordinary expenditures of time and money and will require extraordinary expenditures of time and money greatly exceeding that anticipated in the original retainer agreement with the Family Immigration and Law

6

Clinic;"

- "Attorney is being required to expend an extraordinary amount of time and expenses associated with protecting and preserving the Estate for ultimate distribution to all those who may be entitled to it, as well as Junior;"

- "[T]he proceedings in the Estate of Hillblom require Attorney's full-time attention on a daily basis for Attorney to be fully apprised of all issues and developments and to research and prepare responses to the numerous and voluminous correspondences, briefs and petitions received daily and filed weekly by the various Parties;"

- "Attorney is constantly being required to travel to Saipan, Palau, Hawaii, San Francisco and other placed in briefing, representing and protecting Junior's and the Estate's interest;"

- "[S]ettlement of Junior's claim will not conclude the need for Attorney's representation of Junior; in fact, settlement only shift's Attorney's focus to retrieval or marshaling of assets from third parties, filing of lawsuits against certain third parties for harm caused to Junior's interest, and undertaking actions solely or in conjunction with the Executor and/or other parties for the purpose of minimizing taxes, preserving, maximizing and enhancing the Estate in order that Junior receive fully what he would be entitled to under any settlement agreement or pursuant to the Court's award;"

- "Attorney's representation of Junior's claim, virtually on a daily full-time basis will continue indefinitely, but for no less than an estimated two (2) – three (3) years, form the date of this Agreement;"

- "Attorney's practice, one of the most successful and lucrative in Guam, has tremendously suffered and will continue to suffer as a result of Attorney's full-time attention to Junior's claim;" and

1    •    "[O]n the basis of Attorney's past successes and the extraordinary
2         monies spent and the work already performed an the remaining work to
3         be performed and the amount of extraordinary expenditure of time and
4         money to be expended by Attorney that the contingency fee between
5         Attorney and the Family Immigration and law Clinic in the original
6         Agreement would not fairly and adequately compensate Attorney for
7         the amount of work, risk and time already expended and to be expended
8         by Attorney and the loss already suffered and to be suffered by
9         Attorney in Attorney's past and continue representation to establish
10        Junior's right to a share of the Estate and to protect, preserve, maximize
11        and enhance estate assets and to bring suits against certain third parties
12        for past and continued acts which have been harmful to the Estate and
13        Junior's interest;"

14    25.    Shortly after executing the 38% Retainer, the Attorneys obtained Court
15   approval to use Junior's interim payments from the Hillblom Estate to: (1) relocate
16   Naoko, Junior's grandfather, Marciano Imeong ("Marciano"), and Junior from Palau
17   to Guam, (2) purchase a car and house for them, (3) pay for their utilities and food
18   and (4) pay for guardianship expenditures.  This effectively shielded Junior from
19   outside influences and gave the Attorneys the means to immediately access and
20   control Junior and his grandparents.  It also gave the Attorneys a mechanism to
21   render Junior and his grandparents entirely dependent on them for their well-being in
22   all respects.

23    26.    Although the Attorneys and Naoko purportedly executed the 38%
24   Retainer in January 1997, it took almost six months for the Guam Guardianship
25   Court to amend and conditionally approve the 38% Retainer because the Court went
26   to great lengths to assure itself that that increasing the contingency fee from 22% to
27   38% would be in Junior's best interests.   In briefs the Attorneys submitted in
28   support of the 38% Retainer, the Attorneys argued that their 38% fee was

8

1   proportionate for the work performed to date, the outcome obtained, the huge risk

2   and expenditures undertaken and incurred and the "still tremendous work yet to be

3   performed" for years to come.  Also in those briefs, the highest amount of attorneys

4   fees the Attorneys believed were recognized in the market place was 50%.

5       27.     Before only *conditionally* approving and modifying the 38% Retainer,

6   the Guam Court took several painstaking steps over several months to ensure that

7   the 38% increase was in Junior's best interests including, but not limited to:

8   •   Reviewing and considering hundreds of pages of adversarial briefing

9       submitted by both the Attorneys and FILC on the propriety of the 38%

10      increase;

11  •   Carefully considering a stipulated compromise that the Attorneys and

12      FILC reached to increase the fee to 38% and evaluating the risks

13      inherent in that compromise;

14  •   Conducting multiple hearings on the matter, including one in which the

15      Court took testimony concerning the compromise to increase the fee to

16      38%;

17  •   Considering that both Naoko and Kinney were present and participating

18      in the hearings;

19  •   Taking into account that counsel for the other qualified heir claimants in

20      the Hillblom Probate Case were awarded contingency fees not

21      exceeding 36%;

22  •   Considering testimony from the Hillblom Estate Executor describing the

23      substantial work the Attorneys had yet left to accomplish;

24  •   Considering a stipulation by Naoko and Kinney agreeing to the

25      appropriateness of the 38% fee increase; and

26  •   Confirming that a lawyer had explained the contents and significance of

27      the 38% fee increase to at least Kinney.

28  Even after months of evaluating the 38% Retainer, and taking all of the above into

9

1   consideration, in June 1998, the Guam Guardianship Court conditioned approval of

2   the 38% Retainer on approval by the Hillblom Probate Court, relinquishing its

3   authority to determine the fairness of contingency fee retainers for Junior's

4   representation.  To date, Plaintiff has not seen and Lujan has not produced an order

5   signed by the Hillblom Probate Court approving the 38% Retainer, and Plaintiff is

6   informed and believes that the Hillblom Probate Court expressly capped the fees for

7   the attorneys representing the qualified heirs, including Lujan, in the middle 30%

8   range.

9          28.    In December 1998, the Hillblom Probate Court issued orders assuming

10  the responsibility that the Guam Guardianship Court relinquished concerning

11  evaluating the fairness of the Attorneys' contingency fees and reimbursement of

12  costs, ordering that "[a]ll materials filed, both previously and in the future in the

13  Guam guardianship proceeding shall be filed with Judge Bellas" and reserving the

14  right to ensure costs were justified and that Junior's share of the Hillblom Estate was

15  not unreasonably reduced.  The Hillblom Probate Court even went so far as to

16  appoint at least one special master to evaluate the accounting for Junior's recovery.

17  Since Junior's claims were filed in the Hillblom Probate Case, the Hillblom Probate

18  Court was ultimately responsible for overseeing and approving the fairness of the

19  Attorneys' contingency fees and reimbursement of costs.  At a minimum, the

20  Hillblom Probate Court was ultimately responsible for overseeing and approving the

21  fairness of the Attorneys' contingency fees and reimbursement of costs from

22  December 1998 forward.

23         29.    Knowing that the Hillblom Probate Case's preliminary distribution of

24  $7.5 million to Junior was imminent and to ensure that their gosling Junior would

25  soon begin to lay them his golden eggs, the Attorneys employed Waibel in their

26  conspiracy to establish and serve as trustee to the JLH Trust and seize immediate

27  control over Junior's interests and representation.

28         30.    On April 11, 1999, Conspirators, Naoko and Junior executed the JLH

10

COMPLAINT AND DEMAND FOR JURY TRIAL

1   Trust and Settlement of Trust to receive any and all funds and assets that Junior

2   would recover from Hillblom Estate distributions and other matters arising out of or

3   connected with the Hillblom Estate.  To ensure that they could control Waibel, the

4   JLH Trust and their interests in Junior's recoveries, the Attorneys served as

5   Protectors with the power to remove and appoint trustees and to veto any of

6   Waibel's actions.  Conspirators also used the JLH Trust to give Waibel the sole

7   discretion to employ the Attorneys, reducing Naoko's ability to know about,

8   understand or control their course of conduct.

9       31.    On April 12, 1999, the Guam Guardianship Court approved the JLH

10  Trust, authorized accepting the Hillblom Probate Case's preliminary distribution and

11  denied the Attorneys' request that the Hillblom estate directly pay them their 38%

12  fee.  Junior, Naoko, Marciano and Conspirators were all present at the hearing, and

13  the Court engaged in question and answer sessions with all attendants, including

14  Junior.  The Court ordered that it would supervise the JLH Trust only until Junior

15  reached majority at 18.

16      32.    On April 29, 1999, Plaintiff is informed and believes that the Hillblom

17  estate deposited Junior's preliminary distributions into a trust account established at

18  the U.S. Trust Company in Los Angeles California to be held until the Hillblom

19  Probate Court made its final determination concerning whether the JLH Trust

20  contained sufficient protections for Junior's interests.

21      33.    In the following months, the Attorneys sought and obtained approval

22  for the Hillblom estate distributions from the Hillblom Probate Court.

23      34.    Also in these months, and as more of Junior's money poured into the

24  JLH Trust, Conspirators increased JLH Trust payments to Naoko and Marciano to

25  the tune of hundreds of thousands of dollars couched as guardian fees, protector fees

26  and family expenses.  These increases helped gain their compliance with

27  Conspirators instructions and applications to ensure that there would never be any

28  true contest on Junior's behalf in subsequent proceedings in the Guam Guardianship

1 | Court.

2 |     35.    On April 4, 2000, the parties to the Hillblom Probate Case executed the

3 | Hillblom Global Settlement Agreement to "settle disputes among them, distribute

4 | assets of the Larry Lee Hillblom probate estate, and close the probate estate

5 | immediately."

6 |     36.    On April 5, 2000, Conspirators moved for the Guam Guardianship

7 | Court to approve the accounting for the JLH Trust as being proper in all respects,

8 | and the Court approved the accounting the same day.  The accounting filed

9 | specifically set forth a line item for the Attorneys' contingency fee, and, at least with

10 | respect to the contingency line item, Conspirators were operating at that time under

11 | the 38% Retainer's terms.  By this time, the JLH Trust had received nearly $30

12 | million from the Hillblom Probate Case.

13 |     37.    On April 7, 2000, the Hillblom Probate Court approved the Hillblom

14 | Global Settlement Agreement and Final Distribution of Estate Assets and Liabilities.

15 |     38.    On September 8, 2000, Conspirators applied for and the Guam

16 | Guardianship Court ordered that Junior be admitted to a hospital in a Port Hueneme,

17 | California for medical care.  Conspirators also applied for the Court to expand

18 | Waibel's control over and obligations to Junior by appointing him to serve as

19 | Junior's guardian while he was in California or elsewhere outside of Guam, as well

20 | as assigning Waibel the sole authority to execute any and all documents necessary to

21 | effectuate any and all matters pertaining to Junior's personal well-being.  Although

22 | Junior transitioned from medical care to school in the United States, Conspirators

23 | maintained Waibel's guardianship over Junior while Junior remained in the

24 | continental United States until at least the end of the 2002 school term.  At all times

25 | that Waibel was Junior's guardian, the Conspirators knew that Junior was a resident

26 | of California by virtue of Waibel's California residency.

27 |     39.    Not happy with the contingency fee capped by the Hillblom Probate

28 | Court, after the Hillblom Probate Court approved the Hillblom Global Settlement

1  Agreement on April 7, 2000 (which both Lujan and Waibel executed) and before

2  September 2000, Conspirators took several affirmative steps increase the Attorney's

3  contingency fee to 56%.  The Conspirators sought by this scheme to defy the

4  Hillblom Probate Court's cap on the Attorneys' contingency fee.  Since the 38%

5  Retainer was so comprehensive and underwent a tremendous amount of scrutiny and

6  challenge, Conspirators intentionally kept Junior and any representative legitimately

7  protecting his interests ignorant of Conspirators' actions and to ensure they would

8  never learn of the material facts of Conspirators' scheme in time to have a fair

9  opportunity to challenge the increase to 56%.  In addition, to increase the contingent

10 fee to 56%, Conspirators fraudulently pretended to represent Junior and his interests

11 but, instead, connived at his defeat.  Conspirators' scheme to increase the Attorneys'

12 fees to 56% also corruptly sold out Junior's interests in his recoveries from the

13 Hillblom Probate Case.  In other words, Junior was a victim of Conspirators'

14 extrinsic fraud, and Conspirators' extrinsic fraud resulted in the Guam Guardianship

15 Court's approval of the 56% fee increase without any real contest by either Junior or

16 any representative legitimately protecting his interests and in violation of the

17 Hillblom Probate Court's prior orders capping the Attorneys' contingency fee in the

18 middle 30% range.

19       40.    The Attorneys originally enlisted Waibel either into their scheme either

20 by Waibel's own agreement or by threatening to use their powers and influence—

21 including powers to veto and remove Waibel—as JLH Trust Protectors to coerce

22 him into agreeing to and approving the Attorneys' increase to a 56% fee.  Either

23 way, Conspirators at all times knew that increasing the attorney's fee to 56% for

24 Junior's representation without informing him was improper and against Junior's

25 best interests.

26       41.    Fully aware that they were harming Junior's interests to their own

27 benefit and knowing that the new retainer for a 56% contingency fee ("56%

28 Retainer") was invalid because, in the Attorneys' own words from an earlier dispute

COMPLAINT AND DEMAND FOR JURY TRIAL

1  with FILC, it "was never authorized or approved by the Client," Conspirators

2  executed the 56% Retainer that entirely superseded and replaced the prior retainer

3  without Junior's knowledge, understanding or consent. Conspirators' failure to

4  inform Junior was especially deceitful because Plaintiff is informed and believes that

5  Waibel, and not Naoko, was Junior's operative guardian at the time because Junior

6  was outside of Guam and Conspirators never informed Junior of their execution of

7  the 56% Retainer. Because Waibel was acting as Junior's guardian at the time, he

8  was the only representative with any obligation and ability to protect Junior's

9  interests. These actions corruptly sold out Junior's interests in his recoveries from

10 the Hillblom Probate Case, and Conspirators never gave Junior or any representative

11 in a position to protect his interests the opportunity to negotiate, reject or even

12 accept the terms of the 56% Retainer before Conspirators executed it.

13        42.    Plaintiff is informed and believes and thereon alleges that Conspirators

14 perpetrated additional fraud in the 56% Retainer by backdating it to April 15, 1999

15 when Conspirators knew that they did not in fact execute the 56% Retainer until well

16 after that date. Conspirators' backdating the 56% Retainer to April 15, 1999 was

17 critical to the scheme. The fraudulent date was a material misrepresentation that

18 well before the Hillblom Probate Court distributed any of the Hillblom estate funds,

19 Conspirators bound Junior to pay a 56% contingency fee on all funds received

20 "prospectively" from April 15, 1999, when in fact the 56% Retainer was executed

21 well after the Hillblom estate and associated claims began making their multimillion

22 dollar distributions into the JLH Trust. Had Conspirators not fraudulently backdated

23 the 56% Retainer or informed Junior and any representative legitimately in a

24 position to protect his interests that the 56% Retainer was backdated, Junior and any

25 representative legitimately in a position to protect his interests would have been

26 capable of challenging Conspirators' attempt to take a 56% contingency fee on all of

27 the Hillblom estate and associated claim disbursements. However, Conspirators'

28 fraudulent backdating of the 56% Retainer ensured that Junior and any

1   representative legitimately protecting his interests would remain ignorant that
2   Conspirators in fact never had a right to collect a 56% fee on "funds received
3   prospectively" from April 15, 1999 and induce their consent to the 56% Retainer.
4   This was a material misrepresentation that, if known, would have given Junior and
5   any representative legitimately in the position to protect his interests a fair
6   opportunity to challenge the increase to 56%. In addition, by fraudulently
7   backdating the 56% Retainer, Conspirators fraudulently pretended to represent
8   Junior and his interests but, instead, connived at his defeat and corruptly sold out
9   Junior's interests in his recoveries from the Hillblom Probate Case.

10      43.    On September 5, 2001, Conspirators through Lujan filed an application
11   in the Guam Guardianship Case seeking the Court's approval of the 56% Retainer in
12   violation of the Hillblom Probate Court's cap on contingency attorney fees. Without
13   informing Junior that Conspirators would seek approval of the 56% Retainer that he
14   had never seen and depriving Junior the opportunity to even challenge the filing,
15   Lujan filed the ex parte application pro se and under seal, indicating that "no other
16   Party is entitled to notice since the Trustee of the JLH Trust is empowered by this
17   Court's Order of April 12, 1999 to employ attorneys and other professionals solely
18   in its discretion." In this application, Conspirators neither raised the issue of
19   whether the 56% Retainer was fair to or in the best interests of Junior, nor did
20   Conspirators present any justification for the increase other than to state that the JLH
21   Trust had the sole discretion to enter into such an agreement.

22      44.    On September 6, 2001, Lujan filed a purported joinder by Naoko to the
23   application, however not only was Waibel Junior's operative guardian at the time,
24   but Naoko's joinder did not indicate that Naoko was aware of, had the opportunity to
25   review or understood the implications of the 56% Retainer. Naoko's joinder also
26   lacked any statement concerning whether the 56% Retainer was fair to or in the best
27   interests of Junior or present any justification for the increase. Even if Naoko did
28   read the 56% Retainer—and there is no evidence in the application that she did in

1   fact see, read or understand the 56% Retainer—Conspirators' misrepresentation that

2   in the 56% Retainer that it was executed on April 15, 1999, was a material

3   misrepresentation that would have induced the consent of a reasonable person in

4   Naoko's position and deprived Junior of any opportunity to challenge the 56% fee

5   increase as to all prospective funds received since April 15, 1999.

6       45.   On September 6, 2001, Lujan appeared pro se and alone before the

7   Guam Guardianship Court on Conspirators' application to approve the 56%

8   Retainer.  Because Conspirators committed extrinsic fraud, there was never a real

9   contest in the hearing approving the 56% Retainer.  This was evidenced by the fact

10  that the Guam Guardianship Court failed to indicate anywhere in its approval order

11  that the 56% Retainer was fair to or in the best interests of Junior, nor did it present

12  any new justification.  More importantly, though, the lack of any real contest in the

13  hearing approving the 56% Retainer was apparent because the evaluation in this

14  approval process paled in comparison to the Guam Guardianship's Court's earlier

15  approval process that resulted in its mere conditional approval of the 38% Retainer

16  that lasted six months, entailed heavily contested briefing, testimony from witnesses,

17  questioning of all interested parties and a compromise among them. *Supra* ¶¶ 25-26.

18  Conspirators' extrinsic fraud prior to the hearing guaranteed that there was never a

19  real contest in the Guam Guardianship Court's approval of the 56% Retainer.

20      46.   Even after the Guardianship Court signed off on the 56% Retainer

21  without any real contest to it, Conspirators perpetrated yet another act of extrinsic

22  fraud when Waibel, on behalf of Conspirators, submitted a false report to the

23  Protectors dated October 18, 2001.  Instead of protecting Junior's interests by

24  challenging the 56% Retainer and knowing that the 56% Retainer was in fact not in

25  Junior's best interests, knowing that 56% Retainer was fraudulently backdated did

26  not entitle the Attorneys to 56% of the "prospective" funds received since April 15,

27  1999 and knowing that no matter how effective the Attorneys' were in securing

28  Junior's recoveries the Attorneys were entitled to only a 38% contingency, Waibel

1 | concealed Conspirators' fraud and breaches of their fiduciary duties by instead
2 | lauding the Attorneys for their work and providing false justifications for increasing
3 | their fee to 56%.  In addition, Waibel failed to disclose to the Protectors the material
4 | fact that Conspirators retroactively increased the Attorneys' contingency fee to 56%
5 | for all funds received since April 15, 1999 rather than all simply all funds received
6 | from the date the Court signed off on the 56% retainer.  Thus, the October 18, 2001
7 | letter contained material misrepresentations and omissions to the Protectors that, if
8 | known, would have given Junior and any representative legitimately in the position
9 | to protect his interests a fair opportunity to challenge the increase to 56%.  By
10 | Conspirators' fraudulent October 18, 2001 letter, Conspirators fraudulently
11 | pretended to represent Junior and his interests but, instead, connived at his defeat
12 | and corruptly sold out Junior's interests in his recoveries from the Hillblom Probate
13 | Case.  Conspirators' fraudulent October 18, 2001 letter was a material
14 | misrepresentation that would have induced the consent of a reasonable person in the
15 | Protectors position and deprived Junior of any opportunity to challenge the 56% fee
16 | increase as to all prospective funds received since April 15, 1999.
17 |       47.      Also during this same period, Conspirators perpetrated extrinsic fraud
18 | when Waibel, on Conspirators' behalf, reimbursed the Attorneys for unsubstantiated
19 | costs while intentionally failing to disclose to Junior and any representative
20 | legitimately protecting his interests in the periodic JLH Trust accounting reports that
21 | those costs were in fact unsubstantiated.  The fact that these costs were
22 | unsubstantiated was a material omission from the accounting records that induced
23 | consent.  Instead of protecting Junior's interests by challenging the unsubstantiated
24 | costs, knowing that the approved costs were in fact unsubstantiated and knowing
25 | that paying the Attorneys unsubstantiated costs was in fact not in Junior's best
26 | interests, Waibel concealed Conspirators' fraud and breaches of their fiduciary
27 | duties by instead paying those unsubstantiated costs and then concealing their lack
28 | of substantiation from Junior and any representative legitimately protecting his

17

COMPLAINT AND DEMAND FOR JURY TRIAL

1    interests. Thus, Conspirators' failure to substantiate costs and the omission of the

2    lack of substantiation from the accounting reports contained material

3    misrepresentations and omissions to the Protectors that, if known, would have given

4    Junior and any representative legitimately in the position to protect his interests a

5    fair opportunity to challenge the increase to 56%. By Conspirators' fraudulent

6    October 18, 2001 letter, Conspirators fraudulently pretended to represent Junior and

7    his interests but, instead, connived at his defeat and corruptly sold out Junior's

8    interests in his recoveries from the Hillblom Probate Case. Conspirators' fraudulent

9    October 18, 2001 letter was a material misrepresentation that would have induced

10   the consent of a reasonable person in the Protectors position and deprived Junior of

11   any opportunity to challenge the 56% fee increase as to all prospective funds

12   received since April 15, 1999.

13       48.    As a result of Conspirators' scheme defying the Hillblom Probate

14   Court's orders capping the contingency fees, Waibel actually paid out of the JLH

15   Trust and the Attorneys actually received their increased contingency fees provided

16   in the 56% Retainer and unsupported cost reimbursements to Junior's detriment.

17       49.    By the end of 2001, Junior was only seventeen years-old and, other than

18   knowing where Conspirators moved him, had no knowledge of any of the conduct in

19   which Conspirators engaged to perpetrate their scheme to, essentially, steal money

20   from Junior's recovery from the Hillblom Probate Case. Nor did Junior have any

21   knowledge that Conspirators had actually perpetrated their scheme. In fact, at the

22   end of 2001, Conspirators had so completely concealed the events in Junior's case

23   from him that Junior did not even know how much his share of the global settlement

24   in the Hillblom Probate Case was or even how much money was actually in the JLH

25   Trust until well after an FBI Agent met with Junior on November 10, 2006.

26       50.    On November 10, 2006, an FBI Agent met with Junior in San Francisco

27   and revealed to him for the first time that Conspirators stole money from Junior's

28   recovery in the Hillblom Probate Case. This meeting was the first time that Junior

COMPLAINT AND DEMAND FOR JURY TRIAL

1 | discovered and could have discovered with reasonable diligence that, because of
2 | Conspirators' misconduct and extrinsic fraud, he recovered substantially less than he
3 | was entitled to recover from the Hillblom Probate Case.  Shortly after meeting with
4 | the FBI Agent, Junior discovered for the first time that his ultimate recovery after
5 | the Attorneys deducted their inappropriate fees and unsubstantiated costs from his
6 | approximately $90 million settlement of the Hillblom Probate Case was only about
7 | $12 million.

8 |     51.    On October 15, 2007, Israel executed a tolling agreement that tolled the
9 | statute of limitations for all of Junior's claims against Conspirators from September
10 | 6, 2007 until March 6, 2009.  On October 16, 2007, Lujan and Waibel executed the
11 | same tolling agreement.

12 |     52.    In their ongoing and continuing efforts to conceal from Junior the facts
13 | surrounding these claims, including Conspirators' misconduct in executing and
14 | seeking approval of the 56% Retainer, Lujan has to date rejected Junior's numerous
15 | requests starting in February 2009 to produce the files concerning the Attorneys'
16 | representation of Junior and his interests in all matters at issue herein.

17 |     53.    28 U.S.C. § 1367 tolled the statute of limitations on Plaintiff's claims
18 | while the California Case was pending plus thirty days.

## COUNT I: LEGAL MALPRACTICE

### (Against All Defendants)

22 |     54.    Plaintiff hereby incorporates by reference all preceding paragraphs.
23 |     55.    The 56% Retainer purportedly superseded and replaced the 38%
24 | Retainer, and by this complaint, Plaintiff challenges only the Defendants'
25 | misconduct in connection with entering into and in receiving payments under the
26 | 56% Retainer.

27 |     56.    As counsel for Plaintiff, Defendants owed Plaintiff a fiduciary duty, a
28 | duty not to make an arrangement for, charge or collect an unreasonable fee or an

1    unreasonable amount for expenses and a duty to communicate to Plaintiff in writing

2    the scope of the representation and the basis or rate of the fee and expenses for

3    which the Plaintiff would be responsible.  In addition, Defendants owed Plaintiff the

4    obligation to keep him reasonably informed about the status of his matter, including

5    any changes to the retainer agreement.  Finally, Defendants owed Plaintiff a duty not

6    to acquire a proprietary interest in the subject matter of their representation of

7    Plaintiff beyond the contingency fee provided in the 38% Retainer or self-deal.

8         57.    Defendants breached each and every one of these duties owed to

9    Plaintiff, causing Plaintiff to suffer substantial economic damages, including but not

10   limited to losing the difference between the legal fees provided in the 38% Retainer

11   and the 56% Retainer to which Plaintiff, and not Defendants, was entitled, paying

12   for unsubstantiated costs and losing interest on those amounts as a result of

13   Defendants' misconduct.

14        58.    In the alternative, and to the extent that Defendants were entitled to fees

15   and costs under the 56% Retainer for any funds received after September 6, 2001

16   instead of after April 14, 1999, Defendants breached their duties owed to Plaintiff

17   and caused Plaintiff to suffer substantial economic damages by accepting more in

18   fees and costs than what the operative retainer provided.

19        59.    Defendants' misconduct was malicious, fraudulent, oppressive, and

20   intended to injure the Plaintiff.  Consequently, Plaintiff is entitled to punitive

21   damages.

22

23                    **COUNT II: BREACH OF FIDUCIARY DUTY**

24                          **(Against All Defendants)**

25        60.    Plaintiff hereby incorporates by reference all preceding paragraphs.

26        61.    Defendants, and each of them, owed fiduciary duties to Plaintiff to

27   represent his interests loyally, honestly, and with the utmost good faith in all of their

28   undertakings.

COMPLAINT AND DEMAND FOR JURY TRIAL

62.   Defendants engaged in a series of actions breaching said fiduciary duties, including but not limited to conspiring and taking several affirmative steps to wrongfully perpetrate extrinsic fraud to increase the amount of contingent fees charged to Junior, actually increasing the amount of contingent fees charged to Junior, concealing their self-dealing from Plaintiff, operating without his knowledge, approval or consent and charging Plaintiff for unsubstantiated costs.

63.   Defendants breached their fiduciary duties owed to Plaintiff and caused Plaintiff to suffer substantial economic damages, including but not limited to losing the difference between the legal fees provided in the 38% Retainer and the 56% Retainer to which Plaintiff, and not the Attorneys, was entitled, paying for unsubstantiated costs and losing interest on those amounts as a result of Defendants' misconduct.

64.   In the alternative, and to the extent that the Attorneys were entitled to fees and costs under the 56% Retainer for any funds received after September 6, 2001 instead of after April 14, 1999, Defendants breached their duties owed to Plaintiff and caused Plaintiff to suffer substantial economic damages by paying more in fees and costs than what the operative retainer provided.

65.   Defendants' misconduct was malicious, fraudulent, oppressive, and intended to injure the Plaintiff.  Consequently, Plaintiff is entitled to punitive damages.

## **COUNT III:  FRAUD**
### **(Against All Defendants)**

66.   Plaintiff hereby incorporates by reference all preceding paragraphs.

67.   As fiduciaries for Plaintiff, Defendants were required to fully and fairly disclose all facts that materially impacted Plaintiff's rights and interests both to Plaintiff and his representatives.

68.   Defendants were also obligated not to make misrepresentations or

---

21

1   omissions that prevented Plaintiff from exhibiting fully his objections to any of their

2   fees charged to his interests, that kept him in ignorance of the proceedings

3   concerning fees, that resulted in their fraudulently representing Plaintiff and

4   conniving at his defeat or that corruptly sold out Plaintiff's interests.

5        69.    Defendants in fact failed to fully and fairly disclose to Plaintiff and his

6   representatives material facts that impacted Plaintiff's rights and interests, prevented

7   Plaintiff form exhibiting fully his objections to the 56% Retainer, that kept him in

8   ignorance of the proceedings concerning the 56% Retainer, that resulted in

9   Defendants' fraudulently representing Plaintiff and conniving at his defeat and

10   corruptly sold our Plaintiff's interest, including but not limited to: (1) entering into

11   the 56% Retainer that "was never authorized or approved" by Junior or his

12   legitimate representative and failing to disclose that fact to Junior, (2) by

13   fraudulently backdating the 56% Retainer to April 15, 1999 when, in fact, the 56%

14   Retainer was executed much later, (3) by submitting the fraudulent October 18, 2001

15   report in which Defendants falsely presented 56% Retainer to the Protectors as in

16   Junior's best interests knowing that it was in fact not, (4) by omitting from the

17   October 18, 2001 letter the fact that the 56% Retainer was falsely backdated to

18   retroactively apply beginning on April 15, 1999 and (5) by submitting accounting

19   statements for unsubstantiated costs and omitting that those costs were unjustified.

20        70.    An additional omitted material fact that materially impacted Plaintiff's

21   rights and interests was Defendants' decision and steps taken to increase the

22   Attorneys' legal fee from 38% to 56% even though the 56% Retainer already

23   provided for the same legal services the Attorneys had provided and were to provide

24   under the 38% Retainer.

25        71.    Another omitted material fact that materially impacted Plaintiff's rights

26   and interest was Defendants' decision and steps taken to pay unsubstantiated

27   amounts as costs to the Attorneys.

28        72.    Defendants made their decisions and took steps to increase the

COMPLAINT AND DEMAND FOR JURY TRIAL

1 │ Attorneys' fees and pay unsubstantiated costs without disclosing such facts to
2 │ Plaintiff or any person who was legitimately in a position to protect his interests, and
3 │ these decisions and steps materially impacted Plaintiff's rights and interests in the
4 │ amounts collected from the Hillblom Probate Case settlement.

5 │      73.    Defendants knew that by their conduct, they were making
6 │ misrepresentations and omitting material information that they had a duty to disclose
7 │ to Plaintiff or any person who was legitimately protecting his interests pursuant to
8 │ the fiduciary duties Defendants owed him, and they intentionally failed to disclose
9 │ such material information to Plaintiff or any person who was legitimately protecting
10 │ his interests.  Defendants also knew that by their misrepresentations and omissions,
11 │ they were breaching their fiduciary duties owed to Plaintiff.

12 │      74.    Had Defendants disclosed to Plaintiff or any person who was
13 │ legitimately protecting his interests the material information they intentionally
14 │ misrepresented or omitted, Plaintiff would have had the opportunity to challenge the
15 │ 56% Retainer and payments of unsubstantiated costs that Plaintiff incurred.

16 │      75.    At all times herein, Plaintiff was ignorant of the truth or material facts
17 │ behind Defendants misrepresentations and omissions.

18 │      76.    By their material misrepresentations and omissions, Defendants
19 │ perpetrated fraud against Plaintiff, and caused Plaintiff to suffer substantial
20 │ economic damages, including but not limited to losing the difference between the
21 │ legal fees provided in the 38% Retainer and the 56% Retainer to which Plaintiff, and
22 │ not the Attorneys, was entitled, paying for unsubstantiated costs and losing interest
23 │ on those amounts as a result of Defendants' misconduct.

24 │      77.    In the alternative, and to the extent that the Attorneys were entitled to
25 │ fees and costs under the 56% Retainer for any funds received after September 6,
26 │ 2001 instead of after April 14, 1999, Defendants' material misrepresentations and
27 │ omissions caused Plaintiff to suffer substantial economic damages by paying more
28 │ in fees and costs than what the operative retainer provided.

1   78.    Defendants' misconduct was malicious, fraudulent, oppressive, and
2  intended to injure the Plaintiff.  Consequently, Plaintiff is entitled to punitive
3  damages.

4

5   **COUNT IV:  VIOLATIONS OF 18 U.S.C. 1961 *ET SEQ.* (RICO)**
6   **(Against All Defendants)**
7   79.    Plaintiff hereby incorporates by reference all preceding paragraphs.
8   80.    Each of the Defendants is a "person" within the meaning of that term as
9  used in 18 U.S.C. § 1962(c).
10   81.    Defendants collectively constituted an "enterprise" within the meaning
11  of that term as used in 18 U.S.C. § 1962(c).
12   82.    The aforesaid enterprise engaged in interstate commerce and the
13  activities of the enterprise affected interstate commerce.
14   83.    Each of the Defendants was associated with the aforesaid enterprise.
15   84.    Plaintiff is informed and believes that each of the Defendants
16  participated, directly and indirectly, in the conduct of the affairs of the aforesaid
17  enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §
18  1962(c).
19   85.    Plaintiff is informed and believes that Defendants' racketeering activity
20  consisted of numerous related and continuous acts in violation of 18 U.S.C. § 1341
21  (mail fraud) and 18 U.S.C. § 1343 (wire fraud).
22   86.    Plaintiff is informed and believes that Defendants attempted to commit
23  and committed acts of mail fraud, as that term is defined in 18 U.S.C. § 1341, and
24  wire fraud, as that term is defined in 18 U.S.C. § 1343, on numerous occasions, and
25  committed these acts willfully or with actual knowledge of the illegal activities.  In
26  creating and carrying our their scheme to increase the Attorneys' contingency fee
27  and to collect unsubstantiated "costs," the Attorneys interfaced with Waibel
28  repeatedly by interstate telephone calls, faxes, emails and letters to his place of

COMPLAINT AND DEMAND FOR JURY TRIAL

1 business and residence in Morro Bay, California where Waibel managed and

2 operated the JLH Trust and resided at all times relevant herein. Plaintiff is also

3 informed and believes that Waibel issued money wire transfer orders both into and

4 out of the JLH Trust to Defendants and their accounts from his California office.

5      87. Upon information and belief, Defendants attempted to, conspired to and

6 did affect commerce by said acts of mail fraud in violation of 18 U.S.C. § 1341 and

7 wire fraud in violation of 18 U.S.C. § 1343.

8      88. Upon information and belief, Defendants' continuous and repeated

9 violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 constituted a pattern of

10 racketeering activity within the meaning of 18 U.S.C. § 1962(c).

11      89. Upon information and belief, Defendants' violations of 18 U.S.C.

12 § 1341 and 18 U.S.C. § 1343 injured Plaintiff because these acts caused Plaintiff to

13 suffer substantial economic damages, including but not limited to losing the

14 difference between the legal fees provided in the 38% Retainer and the 56% Retainer

15 to which Plaintiff, and not the Attorneys, was entitled, paying for unsubstantiated

16 costs and losing interest on those amounts as a result of Defendants' misconduct.

17      90. In the alternative, and to the extent that the Attorneys were entitled to

18 fees and costs under the 56% Retainer for any funds received after September 6,

19 2001 instead of after April 14, 1999, upon information and belief Defendants'

20 violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 caused Plaintiff to suffer

21 substantial economic damages by paying more in fees and costs than what the

22 operative retainer provided.

23      91. By reason of the foregoing, the Plaintiff has been, and will continue to

24 be, injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c).

25      92. Defendants' misconduct was malicious, fraudulent, oppressive, and

26 intended to injure the Plaintiff. Consequently, Plaintiff is entitled to punitive and/or

27 a damages multiplier as provided by statute.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

## COUNT V:  CIVIL CONSPIRACY

### (Against All Defendants)

93.     Plaintiff hereby incorporates by reference all preceding paragraphs.

94.     Each of the Defendants was the agent and/or employee of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and/or employment, and that all Defendants acted at all times with knowledge of the actions of each of the remaining Defendants.

95.     As is described in more detail above, from at least 1999-2001, Defendants knowingly and willfully conspired and agreed among themselves, or in the alternative, later joined the ongoing conspiracy and fully ratified all past actions and the purpose of the conspiracy and agreed, *inter alia*, as follows:

- To form the enterprise alleged above for the purpose of increasing the Attorneys' contingency fee from 38% to 56% and to charge Plaintiff for unsubstantiated "costs;"

- To misappropriate and convert Plaintiff's money and assets received in the Hillblom Probate Case settlement;

- To defraud Plaintiff of his settlement money and to breach duties owed to Plaintiff;

- To derive other profits and benefits through the pattern of racketeering activity and other fraud alleged above;

- To enter into the 56% Retainer that "was never authorized or approved" by Junior or his legitimate representative and failing to disclose that fact to Junior;

- To fraudulently backdate the 56% Retainer to April 15, 1999 when, in fact, it was executed much later;

- To submit the fraudulent October 18, 2001 report in which Defendants falsely presented 56% Retainer as in Junior's best interests knowing

1    that it was not;

2    • To omit from the October 18, 2001 letter the material fact that the 56%

3    Retainer was falsely backdated to retroactively apply beginning on

4    April 15, 1999; and

5    • To submit accounting statements for unsubstantiated costs and omitting

6    that those costs were unjustified.

7    96.    Defendants did the acts and things alleged above pursuant to and in

8    furtherance of said conspiracy and above-alleged agreement.

9    97.    As alleged in more detail above, each of the Defendants furthered the

10   conspiracy by cooperating with, lending aid, money and encouragement to, and/or

11   ratifying and adopting the acts of each of the other Defendants.  Each of the

12   Defendants had knowledge not only of the actions of each of the other Defendants,

13   but also of the conspiracy itself and its unlawful and tortious purpose.  The last overt

14   act of the conspiracy is believed to have occurred no earlier than when Waibel

15   caused the JLH Trust to pay the Attorneys their final fee and unsubstantiated cost

16   item.

17   98.    As a direct and proximate cause of said conspiracy, and the wrongful

18   acts alleged herein, Defendants injured Plaintiff and caused Plaintiff to suffer

19   substantial economic damages, including but not limited to losing the difference

20   between the legal fees provided in the 38% Retainer and the 56% Retainer to which

21   Plaintiff, and not the Attorneys, was entitled, paying for unsubstantiated costs and

22   losing interest on those amounts as a result of Defendants' misconduct.

23   99.    In the alternative, and to the extent that the Attorneys were entitled to

24   fees and costs under the 56% Retainer for any funds received after September 6,

25   2001 instead of after April 14, 1999, Defendants' conspiracy caused Plaintiff to

26   suffer substantial economic damages by paying more in fees and costs than what the

27   operative retainer provided.

28   100.    Defendants' misconduct was malicious, fraudulent, oppressive, and

1  intended to injure the Plaintiff.  Consequently, Plaintiff is entitled to punitive

2  damages.

3

4  **COUNT VI:  VIOLATIONS OF CALIFORNIA BUSINESS AND**

5  **PROFESSIONS CODE § 17200 *ET SEQ.***

6  **(Against All Defendants)**

7      101.  Plaintiff hereby incorporates by reference all preceding paragraphs.

8      102.  Defendants' actions constituted unfair and fraudulent business acts or

9  practices within the meaning of California Business and Professions Code § 17200

10 *et seq*.  Defendants breached their fiduciary duties to and deliberately withheld

11 information from Plaintiff so that they could wrongfully increase the Attorneys'

12 contingency fee from 38% to 56% and so that the Attorneys received additional

13 money as unsubstantiated "costs."

14     103.  As a direct and proximate cause of said unfair and fraudulent business

15 acts or practices, Defendants caused Plaintiff to suffer substantial economic

16 damages, including but not limited to losing the difference between the legal fees

17 provided in the 38% Retainer and the 56% Retainer to which Plaintiff, and not the

18 Attorneys, was entitled, paying for unsubstantiated costs and losing interest on those

19 amounts as a result of Defendants' misconduct.

20     104.  In the alternative, and to the extent that the Attorneys were entitled to

21 fees and costs under the 56% Retainer for any funds received after September 6,

22 2001 instead of after April 14, 1999, Defendants' unfair and fraudulent business acts

23 or practices caused Plaintiff to suffer substantial economic damages by paying more

24 in fees and costs than what the operative retainer provided.

25

26     **WHEREFORE**, Plaintiff prays for judgment and relief as follows:

27     1.  Special damages in an amount to be proven at trial;

28     2.  Forfeiture of attorneys fees wrongfully paid to and collected by the

COMPLAINT AND DEMAND FOR JURY TRIAL

1 | Attorneys to be proven at trial;

2 |     3.    Restitution in an amount to be proven at trial;

3 |     4.    Disgorgement of ill-gotten gains in an amount to be proven at trial;

4 |     5.    An accounting;

5 |     6.    Attorneys' fees in an amount to be proven at trial;

6 |     7.    Punitive damages in an amount to be proven at trial;

7 |     8.    Treble damages in an amount to be proven at trial;

8 |     9.    Prejudgment interest in an amount to be proven at trial;

9 |     10.   Costs of this action in an amount to be proven;

10 |     11.   Any other and further relief that the Court deems just and proper.

11 |

12 | Dated:  April 21, 2010                   MARK B. HANSON, ESQ.

13 |

14 |                         By:

15 |                               MARK B. HANSON

                              Attorneys for Plaintiff

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: April 21, 2010

                                        MARK B. HANSON, ESQ.

                              By: _____
                                        MARK B. HANSON
                                        Attorneys for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL